# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 17 2019, 8:58 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel C. Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of K.M. (Minor Child); | September 17, 2019 |
| C.T. (Mother), | Court of Appeals Case No. 19A-JT-651 |
| *Appellant-Respondent,* | Appeal from the Miami Superior Court |
| v. | The Honorable Daniel C. Banina, Judge |
| Indiana Department of Child Services, | Trial Court Cause No. 52D02-1808-JT-7 |
| *Appellee-Petitioner.* | |

**Najam, Judge.**

# Statement of the Case

C.T. ("Mother") appeals the trial court's termination of her parental rights over her minor child, K.M. ("Child").[1] Mother raises two issues for our review, which we restate as follows:

1. Whether the trial court violated her due process rights when it suspended her visitation with Child during the CHINS proceedings.

2. Whether the State presented sufficient evidence to support the termination of her parental rights.

We affirm.

# Facts and Procedural History

Mother gave birth to Child on October 17, 2014. On March 30, 2017, the Indiana Department of Child Services ("DCS") received a report that Child's scalp was missing a two-inch by two-inch section of hair. In response, DCS Family Case Manager ("FCM") Nicole Krohn visited Mother and asked Mother about Child. Mother was "unable to give an explanation for the child's injury[.]" Ex. Vol. III at 16. The next day, FCM Krohn showed pictures of Child's wound to a doctor at Riley Children's Hospital. The doctor informed FCM Krohn that Child's injury was "inflicted" and that it would have been "very painful." *Id*. Thereafter, on April 28, DCS filed a petition alleging that

---

[1] Child's father does not participate in this appeal.

Child was a Child in Need of Services ("CHINS"). DCS did not remove Child at that time.

[4] On May 4, there was "an incident" at Mother's home. *Id.* at 47. A man with a knife "got very upset," and someone called 9-1-1. *Id.* Officers responded to the call and went to Mother's house. Officers then transported the man to a counseling center for a 72-hour mental health hold. The next day, the trial court held an initial hearing on the CHINS petition. Due to the incident at Mother's house the previous day, the court ordered Mother to notify DCS "immediately of any change in the household composition, including providing the identity of any individual sleeping over in the home[.]" *Id.* at 45.

[5] One week later, on May 12, FCM Krohn went to Mother's home to conduct an announced visit. When she arrived, FCM Krohn discovered that an unidentified male had spent the night at Mother's home with Mother and Child. When FCM Krohn asked Mother about the man, Mother could not provide FCM Krohn with the man's first or last name but could only provide a nickname. DCS removed Child from Mother's home at that time. The court ratified DCS's removal of Child from Mother's home and granted Mother visitation with Child. The man was later identified as a convicted child molester.

[6] On June 28, following a hearing, the trial court adjudicated Child to be a CHINS. Specifically, the court found that Child was a CHINS because Mother: was unable to provide an explanation for Child's head wound, was on

probation following a conviction for possession of a controlled substance, had a pending probation violation, and had a new criminal charge for battery. That same day, the trial court entered its dispositional decree and ordered Mother to participate in services, including home-based case management, supervised visitation, a mental health assessment, a parenting assessment, and to follow all recommendations of the service providers.

[7] Between the date of the court's dispositional order and the end of November, Mother "partially complied" with services. *Id*. at 59. Mother completed her clinical intake and parenting assessments, but she did not enroll in the services recommended by the providers. However, at the end of November, Mother "went downhill . . . in her use of drugs[.]" Tr. Vol. II at 46. On November 30, the State charged Mother with several drug related crimes, and Mother pleaded guilty to one count of dealing in methamphetamine, as a Level 5 felony, and one count of possession of a syringe, as a Level 6 felony. As a result, Mother was incarcerated from December 2 through December 15. Shortly thereafter, Mother was again arrested, and, on January 15, 2018, the State charged Mother with one count of possession of a controlled substance, as a Class A misdemeanor. Mother pleaded guilty to that charge.

[8] Mother's arrests became a "hindrance" to her ability to participate in services. *Id.* at 35. On February 14, the trial court entered an order in which it changed the permanency plan from reunification to termination of parental rights. Specifically, the court found that Mother had not complied with services and that she had been arrested on two new drug charges. That same day, the court

ordered Mother to submit to random drug screens due to "concerns about [Mother's] substance abuse" and "her arrests for substance related crimes." *Id*.

[9] Mother was "noncompliant" with services following that date. Ex. Vol. III at 65. In March, Mother missed four out of four possible visits with Child. Further, Mother tested positive for illegal substances at the only random drug test she took. Accordingly, on March 14, the trial court modified its dispositional order. The court ordered Mother's visitation to be suspended until she was "100% compliant with all services for three weeks[.]" *Id*. Thereafter, on May 7, the State revoked Mother's bond in a prior case and arrested her. Prior to that arrest, Mother was "not in compliance with any service." *Id*. at 67. Mother was released from incarceration on June 12. The next day, the trial court held a permanency hearing. Following that hearing, Mother tested positive for methamphetamine metabolites. Mother was again arrested on June 18 and charged with one count of unlawful possession of a syringe, as a Level 6 felony, to which Mother pleaded guilty. And, on July 1, Mother was charged with one count of unlawful possession of a syringe in a separate cause.

[10] On August 21, DCS filed a petition to terminate Mother's parental rights over Child. Mother was released from jail on October 16 and, as a condition of her probation in two prior cases, entered a rehabilitation center on October 19. However, Mother used methamphetamine "right before" she entered the program. Tr. Vol. II at 111. Less than one month later, on November 13, Mother left the program without having completed "even the most minimum of the programming[.]" *Id*. at 90. Mother knew that leaving "would be a

violation of [her] probation" and that DCS had filed a petition to terminate her parental rights. *Id*. at 122. After Mother left the program, she missed two drug screens. As a result of Mother's failure to complete the program, the State filed two petitions to revoke her probation.

[11]     The court held a fact-finding hearing on the petition to terminate Mother's parental rights on December 4. Thereafter, on February 19, 2019, the court entered the following findings of fact and conclusions of law:

> There is a reasonable probability that the conditions that resulted in the [C]hild's removal or the reasons for the placement outside of the parent's home will not be remedied in that:
>
> * * *
>
> 3. On April 28, 2017, the Verified Petition Alleging [Child] a Child in Need of Services was filed as an In-Home CHINS due to the [C]hild having a two inch by two inch section of hair missing from the top of her head; Dr. Stalker confirmed the injury was inflicted and Mother could not explain how the [C]ild received the injury while in her care.
>
> 4. A condition of the [C]hild remaining in home with Mother was that she would, "notify the DCS immediately of any change in the household composition, including providing the identify of any individuals sleeping over in the home, and inform the DCS of the identify of any individuals providing care for or 'babysitting' the child," as ordered by the Court at the Initial Hearing on May 5, 2017.
>
> 5. On May 12, 2017, the [C]hild was removed from the [M]other and placed in foster care after FCM [Miranda] Sipe and FCM

Krohn conducted an announced home visit at [Mother's] residence and an unidentified male, later identified as a convicted child molester who is on the sex offender registry, was asleep on the couch.

6. The [C]hild was adjudicated a Child in need of service[s] on June 28, 2017.

7. The CHINS court entered a Dispositional Decree on June 28, 2017, ordering [Mother] to participate in services which would enhance [her] abilities to fulfill [her] parental obligations.

8. [Mother] was ordered to actively and consistently participate in the following services:

    a. Home Based Services

        i. While Mother had a brief period of compliance between detention and approximately November 2017, all referrals were closed due to noncompliance without meeting an[y] service goals.

    b. Supervised visitation

        i. From the time of detention to approximately November 2017, Mother was adequately consistent with visitation; though she cancelled some visits, her referral was able to remain open.

        ii. Mother's attendance with visits became sporadic at best through November 2017 and after. In early March 2018, Mother failed to attend four of four possible visits and they were Ordered suspended

until she was 100% compliant with other services. Mother has not had any visits since that time.

c. Mental Health Intake

i. Mother did not follow through in completing the appointments for her intake to receive mental health services.

d. Parenting assessment

i. Mother completed the parenting assessment early in the case; she was recommended to participate in individual therapy, a psychological evaluation to confirm [a] suspected mental health diagnosis, a psychiatric evaluation for medication management, and home based case management. Mother did not enroll, schedule, or participate in any of the recommended services, beyond the homebased case management she was already receiving.

e. Random Drug Screens

i. Following arrests for drug related charges, Mother was Ordered to participate in the random drug screen calendar on February 14, 2018. Mother never participated [by] consistently calling in and screening when requested; she continued to test positive for methamphetamine metabolites when screened and had additional drug related arrests.

ii. Mother was released from the Howard County Jail June 12, 2018; she attended a hearing in the underlying CHINS cause on June 13, 2018, and was

given a drug screen after which [she tested] positive for methamphetamine metabolites.

\* \* \*

10. At the time of the Fact Finding Hearing in the CHINS, Mother was on probation in cause 52D02-1604-CM-119 (pled guilty to Possession of a Controlled Substance), and had a pending probation violation, as well as new criminal charges for battery under cause 52D02-1706-CM-178.

11. Mother was arrested on new cause 52D02-1807-F6-166 for Illegal Possession of a Syringe, a Level 6 felony, which was pending at the time of the Fact-Finding Hearing on 12/4/2018. (This Court takes judicial notice of the fact that Mother subsequently pleaded guilty to this charge on February 14, 2019[,] before the same Judge in the same Court.)

12. Mother was charged in cause 34D01-1806-F6-553 and plead[ed] guilty to Illegal Possession of a Syringe; there is a pending petition to revoke probation and warrant for her arrest due to her leaving her Court Ordered substance abuse rehabilitation probation without completing the program.

13. Mother was charged in cause 52D02-1801-CM-16 and plead[ed] guilty to Possession of a Controlled Substance.

14. Mother was charged in cause 34D01-1712-F4-1375 and plead[ed] guilty to Dealing Methamphetamine and Illegal Possession of a Syringe; there is a pending petition to revoke probation and warrant for her arrest to her leaving her Court Ordered substance abuse rehabilitation program without completing the program.

\* \* \*

There is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of the [C]hild in that:

\* \* \*

3. Mother has never taken responsibility for the injury that led to the filing of the underlying CHINS cause; even today she gives no explanation for her child's injury.

4. Mother has refused to engage in offered services to address her own mental health diagnoses and improve her ability to parent.

5. Not only has Mother not taken advantage of services offered to remedy the concerns that led to the child's removal, Mother's circumstances have grossly deteriorated with her methamphetamine use and repeated arrests for drug related charges.

6. Additionally, Mother has demonstrated no desire to change her behavior; she tested positive for methamphetamine the day after being released from incarceration, when she was in Court for a hearing in her daughter's CHINS cause, knowing the Department had filed a petition for the termination of her parent[-]child relationship.

7. By her own testimony here today, Mother admits she left her substance abuse rehabilitation program without completing it, knowing this termination of parental rights case was pending, and that leaving would violate the terms of her probation, which

could lead to her suspended sentence in the Department of Correction being reinstated.

8. Mother also was reluctant to agree that she would participate in the substance abuse rehabilitation if she was given further opportunity, if that was the only way her child could be returned to her care.

\* \* \*

Termination is in the [C]hild's best interests in that:

1. [Child] is entitled to permanency and her needs are paramount . . . .

The Department of Child Services has a satisfactory plan for the care and treatment of the [C]hild, which is: adoption.

Appellant's App. Vol. II at 21-25. In light of its findings and conclusions, the court terminated Mother's parental rights over Child. This appeal ensued.

# Discussion and Decision

## *Standard of Review*

Mother appeals the trial court's termination of her parental rights over Child. We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to

those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[13] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2018). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[14] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[15] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

### *Issue One: Due Process*

[16]     Mother first contends that the trial court violated her due process rights when it terminated her parental rights. "When a State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of the due process clause. Although due process has never been precisely defined, the phrase embodies a requirement of fundamental fairness." *Tavorn v. Marion Cty. Off. of Fam. and Child. (In re J.T.)*, 740 N.E.2d 1261, 1264 (Ind. Ct. App. 2000) (quotation marks and citations omitted), *abrogated on other grounds by Baker v. Marion Cty. Off. of Fam. and Child.*, 810 N.E.2d 1035 (Ind. 2004). In addition, because of the interlocking CHINS and termination of parental rights statutes, "'procedural irregularities in a CHINS proceeding may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *Phelps v. Porter Cty. Off. of Fam. and Child. (In re A.P.)*, 734 N.E.2d 1107, 1112-13 (Ind. Ct. App. 2000).

[17]     In *In re A.P.*, this Court considered "a record replete with procedural irregularities throughout the CHINS and termination proceedings that [were] plain, numerous, and substantial." *Id.* at 1118. Specifically, this Court analyzed seven errors, which included the following: (1) the Porter County Office of Family and Children failed to provide the parents with copies of some, if not all, of the child's case plans; (2) the termination petition did not include any of the statutorily required allegations; (3) the original CHINS petition was unsigned and unverified; (4) the trial court never held a permanency hearing; (5) none of the court orders, including the CHINS dispositional order,

contained written findings or conclusions; (6) the trial court entered a no-contact order against the father without following the statutory prerequisites; and (7) the father was deprived of his right to be present at hearings on at least two occasions. *Id.* at 1117. This court held that, taken together, those errors amounted to a violation of the parents' due process rights such that the Court was "compelled" to reverse the court's termination order. *Id.* at 1118.

[18] Here, Mother contends that she was denied her procedural due process rights with respect to the termination of her parental rights because of a procedural irregularity in the CHINS proceedings. Specifically, Mother asserts:

> Here[,] the procedural irregularity is the cessation of Mother's supervised visitation with her daughter long before the close of the CHINS proceedings. The juvenile court may have had benevolent motivations when ordering Mother's visitation stopped until Mother complied 100% for three consecutive weeks with DCS services. But the reality is, when Mother's largest hurdle with compliance is substance abuse, and the DCS has not referred Mother for substance abuse treatment, making visitation contingent upon consecutive clean drug tests likely exacerbates the problem that needs to be addressed.
>
> For [a] drug addict, hopelessness and emotional turmoil will lead to caving to their addiction. This reality should be acceptable without citation. And, denying a parent access to their child for weeks at a time will cause hopelessness and emotional turmoil. Therefore, it's possible, indeed likely, that the court order terminating Mother['s] visitation with her child until she was 100% compliant contributed to her substance abuse and related legal problems, which in turn made it more difficult for her to comply with the disposition order.

Appellant's Br. at 19-20. In essence, Mother contends that the court's order suspending her visitation contributed to her noncompliance such that termination of her parental rights amounted to a violation of her due process rights.

[19] We first note that Mother failed to raise this issue to the trial court during the termination hearing. It is well settled that a parent can waive a due process claim in a CHINS or termination proceeding by raising that claim for the first time on appeal. *See McBride v. Monroe Cty. Off. of Fam. and Child.*, 798 N.E.2d 185, 194-95 (Ind. Ct. App. 2003). Because Mother did not raise this issue to the trial court, the issue is waived.

[20] Waiver notwithstanding, Mother's claim must fail. Mother contends that the trial court's order suspending her visitation with Child was a "procedural irregularity" because DCS had not provided her with substance abuse treatment and because the order caused her to use drugs. But Mother's argument is not a procedural attack. Indeed, DCS provided Mother with mental health services, which would have likely helped her address her drug addiction, but Mother did not follow through with the recommended services. There was nothing about the CHINS order suspending visitation that amounted to a violation of due process. Rather, the trial court gave Mother notice of the order; gave her an opportunity to respond to it; and outlined exactly what Mother needed to accomplish to resume visitation. Instead, Mother continued to use drugs and not comply with services. Mother has not demonstrated that there was any procedural irregularity in the CHINS proceedings, much less a procedural

irregularity that amounted to a violation of her due process rights during the termination proceedings.[2]

### *Issue Two: Sufficiency of the Evidence*

Mother next contends that the trial court erred when it concluded that: the conditions that resulted in Child's removal will not be remedied; the continuation of the parent-child relationship poses a threat to Child's well-being; and termination is in Child's best interest. However, as Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address Mother's contention that the continuation of the parent-child relationship poses a threat to Child's well-being.

### Reasons for Child's Placement Outside of Mother's Home

Mother asserts that the trial court erred when it concluded that the reasons for Child's placement outside of Mother's home were unlikely to be remedied. Specifically, Mother contends that the conditions that resulted in Child's removal included "Mother allowing a man to sleep at her home on one occasion, without incident, shortly after a CHINS proceeding had been initiated due to an unexplained injury to [Child] from someone apparently pulling the

---

[2] To the extent Mother argues that her due process rights were violated when DCS failed to refer Mother to substance abuse treatment, the "failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *A.Z. v. Ind. Dep't of Child Servs. (In re H.L.)*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009).

child's hair out," but that there was "no evidence that either of these issues would persist[.]" Appellant's Br. at 13.

[23] Mother's argument on this issue misses the mark. This Court has clarified that, given the wording of the statute, it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also any basis resulting in the continued placement outside of a parent's home. *Inkenhaus v. Vanderburgh Cty. Off. of Fam. & Child. (In re A.I.)*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Here, in addition to considering the reasons for Child's initial removal from Mother's home, the court also properly considered the conditions that resulted in the continued placement of Child outside of Mother's home, which included Mother's failure to comply with services, her drug use, and her repeated arrests for drug-related crimes.

[24] And the evidence supports the trial court's findings and conclusions on this issue. To determine whether there is a reasonable probability that the reasons for Child's continued placement outside of Mother's home will not be remedied, the trial court should judge Mother's fitness to care for Child at the time of the termination hearing, taking into consideration evidence of changed conditions. *See E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts

have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[25] The trial court found, and the evidence supports, that Child was removed from Mother's care on May 12, 2017, after Mother had violated a court order and allowed an unidentified male, who Mother later learned had been convicted of two counts of child molestation, to stay at Mother's house while Child was present. The court then ordered Mother to participate in services. Mother partially complied with services until the end of November. But Mother "went downhill" in December because of her drug use. Tr. Vol. II at 46. Mother's drug use resulted in repeated arrests and periods of incarceration. Following one arrest in June 2018, Mother used methamphetamine the day after she was released from jail, which resulted in Mother being under the influence at a CHINS hearing. Mother was incarcerated again only a few days later. And on October 16, two months after DCS had filed its petition to terminate Mother's parental rights, Mother was released from incarceration and again used methamphetamine. Indeed, Mother used methamphetamine right before she entered a rehabilitation program that was a condition of her probation. Then, in mid-November, less than one month before the fact-finding hearing on the petition to terminate her parental rights, Mother left the rehabilitation program without having completed it, even though she knew it was a violation of her

probation in two cases. And after she left the rehabilitation program, Mother missed two drug tests.

[26] Still, Mother contends that her drug use and related legal problems cannot support the trial court's judgment on this issue "because those did not arise until" after DCS had removed Child. Appellant's Br. at 13. But, as discussed above, the trial court can properly consider the circumstances that led to Child's continued placement outside of Mother's home in addition to the reasons for Child's initial removal. *See In re A.I.*, 825 N.E.2d at 806.

[27] Mother's arguments on appeal seek to have this court disregard the evidence most favorable to the trial court's judgment and instead reweigh the evidence in her favor, which we cannot do so. The trial court did not clearly err when it concluded that the conditions that resulted in Child's removal will not be remedied.[3]

## Best Interests

[28] Mother also asserts that the trial court clearly erred when it concluded that termination of her parental rights is in Child's best interests. In determining

---

[3] Mother contends that the evidence does not support the trial court's finding that the unidentified male she had allowed to sleep at her house "was on the sex offender registry." Appellant's Br. at 12. The State agrees and concedes that "the record does not appear to support the portion of the finding that the man 'is on the sex offender registry.'" Appellee's Br. at 21. While both parties are correct that the record does not contain any evidence that the unidentified male was on the sex offender registry, the evidence does support the finding that the male was a convicted sex offender and that Mother had allowed him to stay at her residence despite the court order requiring Mother to notify DCS when other people were staying at her home. Accordingly, we conclude that the portion of the trial court's finding that the man was on the sex offender registry is immaterial to the trial court's judgment.

whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Off. of Fam. & Child.*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child." *In re A.K.*, 924 N.E.2d at 224.

[29]  When making its decision, the court must subordinate the interests of the parents to those of the child. *See Stewart v. Ind. Dep't of Child Servs. (In re J.S.*), 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *Id*. Moreover, this Court has previously held that recommendations of the family case manager and court-appointed advocate to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*.

[30]  Here, Mother contends that termination was not in Child's best interests because she had made "recent remarkable progress with her sobriety." Appellant's Br. at 17. Specifically, Mother asserts that the termination of her parental rights was not in Child's best interests because, with additional time

and "more substance abuse treatment that is referred from and paid for by the DCS," there is "a strong possibility that [Child] will not need long-term foster care, and can reunify with Mother instead." Appellant's Br. at 17.

[31] Mother's contentions on appeal again amount to a request that we reweigh the evidence, which we cannot do. Child's court appointed special advocate testified that adoption was in Child's best interests because Mother is not "stable enough to guarantee that [C]hild's going to be in a safe home." Tr. Vol. III at 78. Further, the evidence demonstrates that Mother received referrals for several services but that she did not complete any one service.

[32] Additionally, Mother has continued to abuse drugs. As a result, Mother has been arrested and incarcerated several times through the proceedings. As a condition of her probation in two of her drug cases, Mother was required to complete a rehabilitation program. However, Mother used methamphetamine the day she checked into the program, and she left the program early without having completed it. That resulted in the State filing two petitions to revoke her probation. Further, by her own admission, Mother missed two drug screens between leaving her rehabilitation program in mid-November and the fact-finding hearing in early December.

[33] Child needs consistent and reliable care, and she needs permanency. The totality of the evidence, including Mother's substance abuse issues and related criminal history and Mother's failure to complete any service, supports the trial

court's conclusion that termination of Mother's parental rights is in Child's best interests. We therefore affirm the trial court's judgment.

### *Conclusion*

In sum, the trial court did not violate Mother's due process rights when it suspended her visitation with Child. And DCS presented sufficient evidence to support the trial court's termination of Mother's parental rights over Child. We therefore affirm the trial court.

Affirmed.

Bailey, J., and May, J., concur.